May I please the court, counsel? My name is Charles Frigerio, and I represent Bexar County Deputies Greg Vasquez and Robert Sanchez in this appeal, an interlocutory appeal of their Qualified Immunity Defense. We are claiming both prongs of the Qualified Immunity Defense. One, that there was no constitutional deprivation, and two, that it was not clearly established that their actions constituted a violation under the Fourth Amendment. We also, after our briefing, submitted a 28-J letter to the court concerning the case of Escobar v. Monty, which Judge Higginbotham was on that panel, because it goes directly to this case concerning the totality of the circumstances. The difference between our two sides from the beginning has been that our position is that this case has to be looked at from a totality of the circumstances, whereas Appellee's position is you look at the three to four seconds prior to the shooting. The Monty, Escobar v. Monty case specifically talks about the totality of the circumstances when you evaluate the Graham factors, and our position is that when you look at the totality of those 12 minutes from when the officer, Vasquez, first arrived on the scene, that this does qualify as, one, under the Graham factor, what is the severity of the crime, whether it's in a felony assault. Two, was the suspect, did he pose an immediate threat? Yes, he attempted to kill Officer Vasquez numerous times with the Ozark trail knife. And three, whether the suspect was actively resisting. And our position was throughout the entire 12 minutes, he was actively resisting. This incident started, the incident occurred on August 28, 2015, and unfortunately started at a time when the decedent's mother told him he was no longer going to be part of the will. An argument ensued, and he was living with his parents, with his wife, and his 17-day-old daughter. Mr. Gilbert Flores savagely attacked his wife while she was breastfeeding. The baby was injured, the wife was injured, they ended up in the hospital. He went to the mother, and the mother was so scared because she saw blood all over that she herself is the one that called 911. When she called 911, she said, the devil is in him, we need help, he is going to, he said he's going to have it out with the police, that's all part of the dispatch. Not only that, but then Gilbert Flores got on the phone, took the phone out of his mother's hand, and told dispatch, you better send SWAT because I'm dying today. I'm going to die. Now having known these factors, as Officer Vasquez arrives to the scene, he actually left his car running, he got out as quickly as he could to get to the situation, he doesn't know what's going to happen, he knew there was a subject with a knife, and there was blood. And he goes to the, and enters the home, and actually no one, everyone is silent, just looks at him, and he's identifying himself as a police officer, trying to find out what's going on. And that's when Gilbert Flores jumps from behind a wall, with his Ozark trail knife, and comes at the officer. Now his testimony is that he could have, this is what we call the deadly force scenario number one, he could have shot him right then and there, if as the police say, these officers are just killers. But that's not what he did, he was concerned with other individuals, although he knew the seriousness of the situation. He decided to back out, even though he had a shield with him, and fortunately he went in with a shield, because he knew the subject had a knife. So he restrained himself and did not use a deadly force and deadly force scenario. Give me a little bit of what his weapon was, it says knife, what do they mean by a knife? The record show. The record, it's part of our briefing, it's an Ozark trail knife, I believe it's nine inches. I'm sorry. An Ozark trail knife, and it's actually part of our brief, I think it's nine, approximately nine inches long. Okay, that's what I didn't, I remember that. Okay. There's a picture of it inside of our brief, actually. Yeah. So the second deadly force scenario, the officer has retreated, and it's important, I think, to note that he immediately gets on his mic and says, we need a negotiator. So he is getting out and he's trying to evaluate the situation, and Gilbert Flores comes out of the home. As Gilbert Flores comes out of the home, he's using the Ozark trail. The threat to the officers here from the knife or from their concern that he would access the weapon in the police car? Both. Well, I'm not sure I'll follow you with regard to the knife. The officer's guns were drawn? Yes, Your Honor. And he's standing more than 10 feet away, and he's got a knife, and I've got a gun. Now, that doesn't pose a threat. I'm concerned about when he moves, his proximity to the car, and what we know about his access, or the possibility that he would get to that weapon. Your Honor, we have, there's basically six scenarios before we get to that last one. Okay. In that second scenario, the officer's holding the shield, and the knife is going into the shield. He's trying to kill the officer, but for having the shield, he would have had to make a decision right then and there to shoot him. He chose to continue to block it. How was that? Because he was, what was he doing with the knife? He was striking the officer's shield, trying to strike the officer, and the officer's blocking him. I'm sorry, I didn't hear you. So the officer's blocking the shield as these knives come, and that's undisputed. That's even the cousin, Chris Flores, testified to that and gave a statement, which is part of the record. So the officer would have been undoubtedly justified at that point as Ozark's knife is going into his shield and shooting the suspect, but he still didn't, he still restrained himself and did not. He's still trying to talk to the individual. Throughout this entire incident, both Vasquez and Sanchez are trying to talk to him to reassure him. They know he's trying to commit suicide by cop. He continues to tell them, I've just done 10. I'm not going back. You're going to have to shoot me. That's what he said throughout the entire ordeal, which lasted 12 minutes. Now on this tape, keep in mind that you see the last seven. You don't see the first five. That's when the Fleming started recording. Subsequent to this incident taking place, what we submitted as exhibit A to our 110 is the FBI enhanced where they put real-time dispatch over what was actually occurring on the video. So that's why you have that. And so you know what the officers are being told by their superiors, which also becomes important as Lieutenant Maldo and Sergeant Pedraza. So as we go into this third, the third scenario goes into effect because Sanchez, officers, Deputy Sanchez comes involved in the scene. When Gilbert Flores sees another officer, he decides he's going to, baby's out, he wanted to get back inside the house. Lieutenant Maldo said he doesn't get back inside. Do not let him go back inside the house. Officer Sanchez, seeing him flee, actually shoots but misses Gilbert Flores at that time. That was the third deadly force scenario. The fourth one, he comes out, Gilbert Flores didn't actually go and say, went to the porch, his front landing, came out with two chairs and is going at Officer Vasquez, keeping in mind, again, there's this colloquy between the individuals, you know, drop it, drop the knife. It's going to be all right. Don't worry about going back to prison. He's saying I will not go back to prison. You're going to have to shoot me. You're going to shoot me today. As this plays out, Deputy Vasquez then decides to take less than lethal use of force by taking out his taser. The taser was activated. It did not strike. The prongs did not strike. One of them hit the chair. The entanglements became involved and as he's struggling and fighting physical contact with Gilbert Flores, the taser drops. The subjects retreat and Mr. Gilbert Flores picks up the taser, which leads to what we call deadly force incident number five, where the officers retreated. They could have chose, as he was trying to activate the taser against them, they could have chose to shoot at that point, but again, they did not. And just so I know, is a taser capable of how to use it, he could have reloaded it. I understand your description and the studied patience of the officers here. We're required to look at the set of facts that resolving the questions of uncertainties about the facts in the favor of the plaintiff here, but let me just read you this and see if you disagree with it. That Flores went to Verquez's patrol car, which was unlocked with a loaded AR-15 inside, tried to open the door when the deputies radioed that Flores was trying to enter the patrol car. Now, Flores moved away from the vehicle, still holding the knife, and he was nearly 30 feet from the officers, placed his hands in the air for approximately five seconds, at which point he fired a shot, killing Flores. Now, my question to you is that, and I may know criticism of officers' conduct here, they were doing what they should do as best they could in the situation. But putting all that to one side, whatever may have been the threat at an earlier point in time, we focus on the question of at that point in time, is if that's factually, if a front or a fact found that to be true, how can you say that a police officer who is with his gun drawn has a threat to his life at that juncture when he's 30 feet away from him? I don't, I don't, one, don't agree with the third. Please understand, I don't, I'm not, I don't know if those facts are true or not, but that is one way you can read this record, and I wanted to put that directly to you and let you speak to that. This deadly force six and seven are very close together within 15 to 20 seconds. As far as going inside the vehicle, the officer knew he had an AR-15 in there. I believe he could have shot right then and there within the 15 seconds before this incident occurred. I understand he could have done all those things, and it's commendable that they didn't. But my question focuses on the, the circumstances being presented that at the time they fired, he was still holding that knife, but he was 30 feet away from them, and they had their guns, weapons drawn, and the argument would be that, that he can't close 30 feet with an eye for that being shot several times, but they didn't do that. They shot immediately under that interpretation of the facts. Now, I just want you to respond to that. Maybe those, those aren't the facts, maybe they're... Well, one, I would say they're not the facts, but we, what is undisputed for sure is the fact that we have Officer Vasquez, Officer Sanchez giving, I'm giving you one last chance, drop the knife. Now, we have to understand what he did, Mr. Flores, after moving from the patrol car where they were concerned about the AR-15, he moves to the officers. He's not giving up. He takes the knife out of his waistband, positions it in his hand in his, at the officers. So that's the last five, three to five seconds. He's positioning a knife in his hand. That's not, that's not a surrender mode. Well, is he 30 feet away or not? 21 feet, 21.5, something. I mean, granted the officers thought he was a lot closer. If you're, if you're in that scenario, you're thinking you're closer. I could find 30 feet. I would assume from the record, but I'm going to call you about 21 feet, but that's at least 20. And, and the command was to put down the knife. Put down the knife. The only way to put it down is to take it out of your waistband. Not to take it out of your waistband. No, they didn't tell him to put down the knife until after he'd taken it out of his waistband. No, I'm asking whether or not he could put it down without removing it from his waistband. That's what I'm asking. Sure, he could have just dropped it. He moved it like this and put it like this and switched hands in a pre-attack indicator. That's what that was. I think you're agreeing with me that in order to drop it, he's got to take it out of his waistband. But when he was told to drop the knife, he wasn't in his waistband. It was in his hand. So they weren't commanding him to put the knife down before he... Well, he had the knife before. You have to understand this under this parlay. He had the knife in his hand. When he went to the car, he put it in his waistband. He opened the car door, closed the car door, stepped back out, then took the knife back out of his waistband and held it up like this, going toward the officers. So the command at that point was what? What were the officers asking him to do at that point? Given you one last chance, drop the knife. And that's undisputed from the record, Your Honor. Well, what's the immediate threat to the officer's life at that point? They're out of patience with him and he's not obeying them, but... The fact that it's a continual threat. AR-15 is a, you know, if he had stayed in that AR, gone for that AR-15, of course. They were broadcasting, don't let him get that gun, of course. But that, we ask, on that factual term, the facts appear to be, he dissipated. He moved away from the car and now he had the knife. He had the wrong knife. He's not, and that's my question, that's our ultimate question here, is whether or not the question of the necessity of the force, reasonableness of the use of the force at that juncture... Yes, Your Honor, and that's why the circumstances at the test, as you pointed out, in Escobar, with the individual parachute... Of course it's the totality of the circumstances, but... But in Escobar, he was laying on the ground, Your Honor. He didn't have a knife in his hand. He was, they called him Parachute Man. Well, I'll put it to you a different way. He dropped the knife and then they shot him anyway because he'd been such a threat. If he had dropped the knife and it's on the floor, could they have shot him? They wouldn't have, no. If he had dropped the knife, that's all they wanted to do. The only threat was the fact that he had the gun in his hand. The knife in his hand, the knife that he had stabbed the shield of Officer Vazquez with at least 12 times, the record has. So he had tried to kill him, no question. Thank you. Thank you, Your Honor. You may proceed. Thank you. It is a tragic fact that most of our civil rights jurisprudence involving excessive force cases arises out of circumstances where people are engaging in pretty reprehensible conduct. As it turns out, people to whom the police apply excessive force are generally not law-abiding citizens, and the Court is always faced with a situation where there was obviously some threat to the police officers versus judicially vitiating an entire court statute that was designed to keep officers in check. If the Court reverses the trial court's decision and concludes that as a matter of law, this grainy video shows a pre-assaultive conduct as opposed to surrender, it essentially takes these cases out of the hands of a jury and puts them in the hands of an interlocutory, allows every factual dispute that goes in the favor of the plaintiff in these cases to be subject to de novo review in a mini pre-jury trial before the case is actually determined by the fact-finder. Not only is there no case on point that suggests that that's appropriate, this Court's decisions have expressly stated that interlocutory review is only when all of the facts are undisputed. That is not the case here. Most of them are. But the essential fact, the one of what was this person doing when he raised the knife over his head, that is a factual dispute that cannot be resolved as a matter of law. This is the problem here, and I think that part of the story that was not told is that we know that he had his hands over his head. We claim that he was in a surrender pose. We know that he was motionless for five seconds. He was not making any forward momentum towards the officers. We have an admission from the officers that as he was standing there, they looked at each other and said, we have to end this, a conscious admission that they were going to shoot him before they fired. In other words, they were just tired of it. But did the officers then, when documenting this incident, go back and explain what just happened? No. The version that they put in their police report was that the Mr. Flores came running at them from a distance of six to seven feet, brandishing a knife, and that's why they shot. Then, after that lie is exposed through video that they didn't know was being taken, they have the gall to argue that there was no real clearly established law here that would have guided their decision-making. Ironically, the clearly established law that is precedent, that they rely on now in this case, is that the made-up story that they claim that they should have done, or that they claim that they had did before they were outed by the video. The law was clearly established, and the law has been since Graham v. O'Connor, which asks — excuse me, Graham v. O'Connor, which advises this Court that of the three things that it considers, is there an immediate threat, as you noted, repeated to Judge Igbebotom, and is the subject actively resisting arrest at the time of the incident? Neither of those are conditions in which deadly force could have been used, perhaps, but the goal here was to have him surrender. And I think I can distinguish, or we have distinguished, all of the cases on which they rely in our briefing, and I don't want to use my time before the Court to talk about cases unless you have specific questions about them. But what I'd like to do is focus on the public policy implication that happens if this case is reversed. I already touched briefly on the jurisdictional issue, about how essentially this is going to prolong those cases even longer than they already generally go for. But the idea that we need to have an appellate case directly on point, like identical facts, in order for there to be clearly established law, simply cannot be the case. And it is parroted repeatedly throughout briefs, not just in this case, but in every single one, of, well, we don't have a case just like this one, therefore the law is not clearly established. But that's not the standard, and it has to be. The Supreme Court noted in 1997 in United States v. Lanier, there's never been a Section 1983 case accusing welfare officials of selling foster children into slavery. But it doesn't follow that if such a case occurred, those officials would be immune from liability. And that simply makes sense. If the State or the government actors are essentially entitled one free bite, they can do one thing wrong, engage in unconstitutional conduct, and be immune for it because there's never been a case like it, no one will ever file these lawsuits. Everyone will realize that if yours is the first one where it's happened, then you basically have no possible remedy. The Supreme Court has recently, in three different cases in the past six or seven years, talked about situations where the law was not clearly established. And it's plainly different from what we have today. In, excuse me, a case called Reichle v. Howard in 2012, the plaintiff argued that he had a First Amendment right to be free from a politically retaliatory arrest even when the arrest was supported by probable cause. And he filed suit under 1983 saying this was a faulty arrest and my Fourth Amendment rights were violated. And the Supreme Court said quite correctly, that's quite a reach. No one's even made that argument before. The idea that an officer should have known that this was politically retaliatory and couldn't arrest you, there's no precedent for that. In Ashcroft v. L. Kidd, which was also in 2011, there the plaintiff argued that individualized suspicion was necessary to obtain a warrant under the Federal Material Witness Statute, a statute that had never been determined yet or never been interpreted yet. Plainly different than here. In White v. Pauley, which is the other one on which the defense relies in its brief, the plaintiff argued that an officer who arrives late to an ongoing police action should have presumed that his colleagues failed to follow proper procedures. Once again, the Supreme Court said that's just not — that's never been discussed before. But there are a legion of cases going back saying that you need to have a dead — excuse me — immediate threat to the safety of the officers and have an actively resisting arrest situation before you can use deadly force. And there are numerous cases dealing with knives or guns or one — one version of the other. I think ultimately that we're saying that the law must be sufficiently clear to put — to give notice to an officer as to what he can do. And one of the ways of doing that is to have the law clearly established. But there are some situations that — this is just me making one suggestion about this — that it's fundamental in the use of lethal force in itself. Every officer knows he cannot take a life that's a life that's threatened of another, himself or someone else. But the question becomes then whether or not the — in that fact — in that circumstance. Now, I — the question is, do you have to have a case that says that someone is 30 feet away from you holding a knife and you're armed and they're not, with two handguns aimed on them, that you can fire or not? I don't know. I don't know what the Supreme Court says about that. It does not strike you as intuitively right. That is, Your Honor, that is essentially the argument that they're making, that there's not a case just like this one. But I — I'm just suggesting to you that I don't know that we have a whole lot more insight into the Supreme Court's jurisprudence here than you do. And they're not even asking me, so — It's not quite as obscure as the last tax case, but — Right. — in that doctrine. But nonetheless, it's difficult. And the truth is, the Court's struggling with a lot of these cases, and they're not easy. And with respect, I think, you know, there's an old adage that sometimes the best ruling is when you don't have to make one in the first place. If this Court resolves the jurisdictional dispute by saying that was a fact issue for the jury to resolve, it doesn't have to address the complicated issue of, as a matter of law, was he resisting or not? That can be left for the jury's determination. It can be reviewed on abuse of discretion standard or for sufficiency of the evidence. Excuse me. You look like you're about to ask a question, Judge. No. You know, we still have juries, but not everybody trusts them. And they — that's where we — these questions ultimately come down to who's going to decide. And that's what this doctrine is about. And that's not a criticism. It's just a description of what it's worth. And so that's what we're — are we going to decide this, or is the jury going to decide it? Well, I think this Court answered that question earlier this year in a case called Darden v. City of Fort Worth. The actual circumstance is slightly different, but the point being there was a video recording of a police altercation in a suspect's home. The suspect was eventually thrown on the ground and tased to death. The video never captured that. The police said the video suggested that maybe he was resisting. Obviously, there were eyewitnesses in this home that said there's no evidence of that. And this Court said because the video does not provide absolute, untrammeled clarity such that the non-movement evidence could not be believed by anyone, this remains a fact issue for the jury to decide. I think, you know, like you said, not sure who trusts juries. Well, in the Darden, this Court trusted juries. And it was because the video was not sufficiently clear on a point that would otherwise turn the summary judgment standard on its head. What's the fact issue we'd be leaving to the jury in this case? They'd be determining whether or not the police were — had a reasonable belief that their life was in danger that required them to use deadly force. And this Court's pattern in jury instructions on when qualified immunity is appropriate specifically spells out to the jurors exactly what they have to believe. And they'll answer that question yes or no. And if they answer question one in the negative, the rest of the case is over. But then when this Court reviews it on appeal, it's going to allow the — it's going to give deference to the jury's determination because they were the ones that had the ability to hear from the witnesses, to see live testimony, to look at the evidence, as opposed to simply having it come up here on de novo review where we just received transcripts. So the question is whether the officer had a reasonable belief. Yes. It was an imminent threat. Yes. And, for example, a jury, if this case is remanded and allowed to be tried, or the case is confirmed and allowed to be tried, a jury might hear the officers testify that they really felt that they had a reasonable belief that they were going to be killed. The difficulty is that if you start from the basis that qualified immunity is more than a defense to liability, it is also a defense to being tried. And that's why — that's the premise on which we move. And that makes it difficult. Otherwise, we can handle those cases very well, in fact, since you go to trial the jury. But with qualified immunity, we're trying to protect the people who are in service to the government from being put to trial, to stand the risk of trial, because — making it — simply because they made a mistake of some sort of whatever. And that's where — that's where the zone we're working, and it's very difficult to sort those cases out. Agreed, Your Honor. I think that, to the extent there is a balancing problem here, we have to consider whether the judicially created doctrine of qualified immunity somehow trumps Rule 5 — Federal Rule of Civil Procedure 56. But that's — that's a very fine argument, but unfortunately, it's beyond our compass. D.C. is where you get that answer, not here. Oh, I mean, in pure candidness, I mean, I would imagine whoever winds up in this tribunal unsatisfied is going to be, you know, mailing a — I appreciate your argument, and you're an advocate. I'm not suggesting otherwise. I'm just — I just wanted you to understand and be clear that we see a lot of these cases, and they simply are not easy cases, and they're very — some of them are easier than others, but some of them are just very, very difficult to decide right or wrong. Correct. But the jurisprudence is dynamic, and it's — we're not where we are. Well, in its consideration of the facts in the law that currently exist, I think that the prudent route is to remand and allow the jury to consider, not simply because we know what Washington will do one way or the other, but because it's the right thing to do. Allowing a jury to resolve a fact dispute not only puts the conscience of the community and people that can weigh the evidence and allow them to make that determination, but it also, frankly, keeps this Court from hearing interlocutory appeals in every single Section 1983 case simply because the government didn't like the result. Now, if we didn't like the result, we'd have a final judgment, so we can't appeal it. But the cases — essentially, in the cases where the officer's conduct is so flagrant that the judge says, I think there's a fact issue here, and I'm going to allow the jury to resolve it, those are the ones that right now under the current — In fact, they seem to disagree on what the officer's or what the suspect's intentions were. They both agree that he stood there with a knife in his hand, with his hands raised. There's no dispute about that. That's correct. The dispute is about what he intended. Correct. And they have hired an expert. But how is that a factual dispute? Because at the end of the day, a determination needs to be made of whether the officers were in danger for their life. And we have a grainy video that shows, you know, our clients' — or, excuse me, our witnesses say that he was palming the knife, that he was basically holding it in the air, showing that he was not making any stabbing motions. They have an expert that says, you know, based on his analysis of the video, this is clearly a threatening gesture. There's a factual dispute here. Or at least — at least there's a dispute as to how the evidence should be interpreted. But it's not going to be done as a matter of law, any more than as a matter of law is this person telling the truth. That's just the determination that's appropriate for the fact finder. I think another thing that's worth discussing here is this suicide-by-cop phenomenon, which this Court has recognized as a condition that — an unfortunate one — since early 2000. Opposing counsel advocates for the totality of the circumstances test. And as a result of all of the misdeeds that our clients engaged in, that somehow that should be — allow for the use of deadly force even when there's no longer a threat. And, yes, candidly, the phrase totality of the circumstances appears in virtually every one of these cases. But that's not really an argument. It's a — it's a truism. We always look at the totality of the circumstances. And the fact that immediately prior to shooting him, there were a long list of — of characteristics that I went out earlier. There was no forward motion. It was bright. It was daylight. You could see what he was doing. There was no threat. As you noted, Judge Higginbotham, this is essentially bringing a knife to a gunfight. That's the type of situation where de-escalation tactics are most appropriate. And that was their goal here. They knew from the outset this was suicide-by-cop. This isn't something they discovered as a result of his behavior. So what essentially the argument that the defense is asking for would essentially allow for deadly force to be used in every suicide-by-cop regardless of the — of the exposure or the actual threat to the officers, which, again, is exactly the opposite of what we were trying to achieve. In fairness to the officers, they were — they were very patient with this fellow in terms of — I mean, they — they were doing what they should do in the best of training to try to de-escalate the situation, take it down, take it down, take it down. So that did happen, but that doesn't answer the — the ultimate question of what happened in the — at the time that they — did they need to shoot him at that time, or could a reasonable police officer have been — seen a threat to his life or the life of another? And that's a — that is really, I think, the question, and then the ultimate question, but that — that doesn't answer the question of who decides that. Correct, Your Honor. I would like to draw the Court's attention to two cases, both from this Court. One is called Lytle v. Bayer County. It was a 2009 case. And there, this Court specifically held an exercise of force that is reasonable at one moment can become unreasonable the next if the justification for the use of force has ceased. Again, we're going back to the ultimate question here is, was it justified? And this Court has to determine who gets to make that decision. The other one is an unpublished case, which I would note because I know it doesn't have precedential value under this Court's rules, but it's Reyes v. Bridgewater from 2010. And the judge — excuse me — Judge Haynes specifically noted the difference between the threat posed to an officer by a knife vis-à-vis a gun. She noted specifically, the immediacy of the risk presented by a man armed with a kitchen knife at his side is far less than that of a man armed with a gun. Now, opposing counsel in the 28-J letter noted a recent decision in which a suspect had a knife nearby, and because they were afraid that he might get it, they sicced a police dog on him, and he suffered injuries. That case quotes Graham v. Connor as part of its analysis. It never really answers the question of whether an attack dog is deadly force. The other circumstances about that case, though, that are, I think, salient in why it's distinguishable is it's undisputed that that particular suspect was engaging in this behavior at night, where there was limited vision. He had been hiding for 20 minutes while he was trying to escape the police. And in Justice Scalia's opinion for the Court in Scott v. Harris, he noted that treating fleeing suspects or giving the police a little bit more leeway has an important public policy rationale for it. And that is the argument in these fleeing suspect cases was — from the plaintiff's side was, well, why don't you just let the guy go? If he wasn't hurting you, he was trying to get away from you, you know, why did you need to ram the back of his car? Why did you need to fire bullets at his tires? Why didn't — and Justice Scalia, I think, quite correctly noted for the Court, because it essentially rewards people that flee. And, you know, if you drive just fast enough or make as many evasive maneuvers as possible, eventually they're going to let you go. And that simply makes no sense. Here it's undisputed that our guy was not trying to flee. He was standing motionless. And if you haven't had an opportunity to watch the video that's in the record, please do. It is absolutely shocking. And I have told numerous people about the facts of this case, and then they watch the video, and they still — it is undisputed that our client, or the decedent, I should say here, engaged in some very horrible activities. Watching what amounts to an execution is thoroughly shocking. And frankly, the type of thing that a jury should be allowed to consider when then wondering why this officer went back — or these officers went back and wrote reports that were completely contrary to what happened. And then, when those jurors are asked to consider were the officers in reasonable fear of their life, they can also consider the fact that they lied immediately afterwards, probably to protect themselves, because they know what they did was wrong. Your Honor, if you have any additional questions, I'd be glad to answer. Otherwise, I rest on my briefs. Thank you. Rebuttal. Thank you, Your Honor. Two important points I need to make. The Mullinex case, the Supreme Court case, was very similar to this one. It dealt with the second prong of the established — whether or not it was established that the actions of the officer were violative of the law. In Mullinex, that was the DPS trooper that was standing on the overhead bridge that shot  In that case, the trial court and the Fifth Circuit denied qualified immunity. The Supreme Court, per curiam, said that the standard was that the qualified immunity would be — would be established because it wasn't clearly established that what he was doing, mainly DPS trooper Mullinex, violated the law. The second case I want to point out specifically with the questions we had previously was Clayton v. Columbia casualty. This court held that strict — quoting from the case, strict reliance on the precise moment an officer fires his weapon is inappropriate when the totality of the circumstances is the touchstone of the reasonableness inquiry. Then we have the recent Supreme Court case, which is, in our brief, the Casella case out of the Ninth Circuit, where the Supreme Court granted qualified immunity to an officer who just heard that a female with a large knife was whacking at a tree. He came to the area that he was called to. He saw an individual standing by the tree and a woman coming out of the house with a large butcher knife. He ordered her to stop twice, and she had it on her side. He ordered her to stop twice. She didn't. He went down under the fence and shot her. They held, even though he was only there for less than a minute, that he was entitled to qualified immunity. And in this particular case, Your Honor, I believe that Officers Vasquez and Sanchez, who did show an exercise restraint, when you look at the totality of the circumstances, they are entitled also to qualified immunity. I cite the case of Smith v. Freelander, which is a Sixth Circuit case. I often have cited this in cases I've used with regard to qualified immunity, quoting, We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes reasonable action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure. My clients were involved in 12 minutes where they were in fear of their life throughout. I think they acted reasonably. And when we look at what the trial court held in denying qualified immunity, it said, We deny qualified immunity because a reasonable officer could conclude that Flores was no longer resisting in singling surrender. That's not the standard, Your Honor. The standard is every reasonable officer would have to conclude that their actions violated the Fourth Amendment. Now, they might come up with a reasonable officer, but I've got a former commander of DPS, Commander Rodriguez, who's a reasonable officer, who said that their actions were reasonable. And unless you can show that all reasonable officers would conclude that what they were doing were violative of the law, we are entitled under the second prong to the Graham v. Conner standard to qualified immunity. I would ask the court to please reverse the trial court's denial of qualified immunity and grant qualified immunity to Deputies Vasquez and Sanchez. Thank you. Thank you, counsel. We'll take the matter under advisement.